**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

FILED

2013 DEC 13 AM 8: 48

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, PATTI NILSSON and JOANN SMITH, | ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| EYE CENTERS OF FLORIDA, P.A., | ) ) |
| Defendant. | ) |

Civil Action No. _____
2:13cv842-FtM 38UAM

FILED UNDER SEAL
JURY TRIAL DEMAND

**DO NOT PLACE IN RUN BOX**

**DO NOT PLACE ON PACER**

---

### PLAINTIFF-RELATORS' QUI TAM COMPLAINT

---

Plaintiff-Relators, Patti Nilsson and JoAnn Smith, bring this *qui tam* action, pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.*, ("FCA") in the name of and on behalf of the United States of America ("Plaintiff"), by and through their counsel of record, and state as follows:

### INTRODUCTION

This is an action by *qui tam* relators, Patti Nilsson ("Nilsson") and JoAnn Smith ("Smith") (collectively "Relators"), to recover penalties and damages arising from violations of the FCA committed by Defendant, Eye Centers of Florida, P.A. ("ECF"). Relators claim that Defendant performed and/or caused to be performed medically unnecessary tests and surgeries on Advantica Medicare patients based on falsified patient records. Relators further allege that Defendant knowingly presented or caused to be presented false and fraudulent claims and claims based on false and fraudulent medical records to the United States



Government or its contractors and agents in order to be reimbursed for these unlawful tests and procedures in violation of the FCA.

## PARTIES

1.      Defendant ECF is a professional corporation formed pursuant to the laws of the State of Florida. Its principal business address is 4101 Evans Avenue, Fort Myers, Florida 33901. The registered agent for service of process on Defendant is Jeanne Smith, and the address for service of process is ECF's principal business address. ECF owns and operates twelve eye care centers throughout the Fort Myers, Florida area where ophthalmological services are provided to recipients of Medicare, as well as other patients. Defendant's ophthalmology centers are located at the following addresses:

Bonita Springs
26831 S. Tamiami Trail
Unit 47
Bonita Springs, Florida 34135

Cape Coral
2301 Del Prado Boulevard South
Unit 650
Cape Coral, Florida 33990

Clewiston
820 West Sugarland Highway
Clewiston, Florida 33440

Fort Myers- Main Clinic, Surgery & Aesthetics
4101 Evans Avenue
Fort Myers, Florida 33901

Fort Myers East
4881 Palm Beach Boulevard
Suite 200
Fort Myers, Florida 33905

Fort Myers South
15661 San Carlos Boulevard
Suite 4
Fort Myers, Florida 33908

Immokalee
555 North 15th Street
Immokalee, Florida 34142

LaBelle
870 West Hickpochee Avenue
Unit 1400
LaBelle, Florida 33935

Lehigh Acres
3507 Lee Boulevard
Lehigh Acres, Florida 33971

Naples North
877 11th Avenue
Unit 2
Naples, Florida 34108

Naples South
2500 Tamiami Trail North
Unit 109
Naples, Florida 34103

Port Charlotte
18316 Murdock Circle
Suite 108
Port Charlotte, Florida 33948

2.     ECF employs five ophthalmologists, including Barrett R. Ginsburg, Quentin B. Allen, Claudio A. Ferreira, Shailesh Gupta, and David C. Brown, who is also ECF's Medical Director and Founder. ECF also employs thirteen optometrists, including Karen Memoli, Frederick Brown, Kelly D. Anderson, Michael F. Spencer, Rachel Chant, Emilio J. Martinez, David J. Overholt, Robert Underberg, William R. Cutting, Nicole A. Tyrell, Jill R.

Sagona, Tan-Long Pham, and Eric J. Eiselman, one ocularist, Dean B. Scott, and one ophthalmic plastic surgeon, Allison B. Yee. Additionally, ECF employs numerous certified and non-certified ophthalmologist assistants ("OA").[1]

3.      Relator Nilsson is a resident of the State of Florida. Her current address is 1619 Ibis Court, Punta Gorda, Florida 33982. Nilsson has worked as an OA since 1988 and became a certified OA in 1992. She has lived in the State of Florida since May 2013.

4.      Nilsson was employed by Defendant ECF as a certified OA from approximately August 1, 2013 to present, and thus has firsthand knowledge of ECF's falsification of medical records and performance of tests and surgeries based on falsified records and when not medically necessary. Nilsson has personal knowledge of ECF ordering unnecessary tests, falsifying eye test scores, and scheduling unnecessary eye surgeries based on these false test scores with respect to Advantica Medicare patients and therefore constitutes an original source, as defined in 31 U.S.C. § 3730(e)(4)(B), of the infractions contained herein.

5.      Relator Smith is a resident of the State of Florida. Her current address is 1787 Four Mile Cove Pkwy #426, Cape Coral, Florida 33990. Smith has worked in healthcare financial management since 1995, during which time she gained extensive experience in healthcare billing procedures.

6.      Smith was employed by ECF as a Clinic Operations Manager, which includes charge capture for reimbursement, from approximately July 15, 2013 to October 24, 2013, and thus has knowledge of ECF's provision of services in violation of Medicare

---

[1] The information in this Paragraph is available at ECF's website, http://www.ecof.com/, under About Us: Our Doctors and Locations.

requirements, and ECF's performance of and requests for reimbursement for tests and surgeries based on falsified records. These actions resulted in false and fraudulent claims for healthcare services being presented to the Government or its contractors or agents by ECF. Smith has personal knowledge of ECF's billings to Advantica Medicare and therefore constitutes an original source, as defined in 31 U.S.C. § 3730(e)(4)(B), of the infractions contained herein.

## JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as well as 28 U.S.C. § 1345 (as the United States is a Plaintiff) and 31 U.S.C. § 3732 (the FCA).

8.     The Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant's principal place of business is in this judicial district, Defendant's ophthalmology centers are located in this judicial district, and Defendant purposefully conducts business in this judicial district.

9.     Venue is appropriate within the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because the illegal acts and practices alleged in this Complaint occurred in this judicial district.

10.     Relators have made the appropriate voluntary disclosures to the United States Government prior to the filing of this lawsuit on behalf of Plaintiff as required by 31 U.S.C. § 3730(b)(2).

## SUMMARY OF APPLICABLE LAW

### A.    The False Claims Act

11.    Congress enacted the False Claims Act which provides, in pertinent part, that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the United States Government for civil penalties and treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B). Under the FCA, the terms "knowing" and "knowingly" mean that a person, with respect to information "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

### B.    The Medicare Program

12.    In 1965, Congress enacted Title XVIII of the Social Security Act, commonly known as the Medicare program, to pay for the costs of certain healthcare services. The Medicare Program is a federal health insurance program for older Americans and persons with disabilities. Individuals who are insured by Medicare are known as beneficiaries. Medicare is funded by the federal government and administered by the Centers for Medicare & Medicaid Services ("CMS").

13.    The Medicare program is comprised of several parts. Healthcare services and payment under Part C of the Medicare program are the subjects of this case (although, upon information and belief, other parts of the Medicare program are also implicated).

14.     To administer the Medicare program, private insurance companies act as agents of the Department of Health and Human Services ("HHS") in making payments on behalf of the program beneficiaries and providing other administrative services and/or managing benefits via contracts with HHS. Advantica Medicare is a Medicare vision plan available to Medicare beneficiaries, and is the Medicare plan at issue in this case. Medicare beneficiaries can purchase Advantica plans to provide vision benefits. Advantica is an agent or contractor of Medicare, and thus providers who present false claims to Advantica are subject to FCA liability pursuant to 31 U.S.C. § 3729(b)(2)(A).[2]

15.     Other private insurance companies, such as Medicare Administrative Contractors ("MAC") under the Medicare Part B program, act on behalf of CMS to help administer the traditional Medicare program as well. 42 C.F.R. §§ 405.1801(b), 421.5(b). First Coast Service Options, Inc. ("First Coast") is the MAC under contract with CMS to administer or aid in administering Part B Medicare claims in Florida. Medicare, through First

---

[2] (2) the term "claim"--

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729(b)(2)(A).

Coast, establishes and publishes the criteria for determining which services are eligible for reimbursement or coverage. This information is made available to the providers who seek reimbursement from Medicare. Companies like Advantica utilize Medicare guidelines in managing vision benefits, but may also adopt additional, more demanding guidelines at their discretion.

16.     Healthcare providers rendering services to Advantica Medicare beneficiaries or traditional Medicare seek reimbursement by submitting a claim form to Advantica which is a "Request for Medicare Payment" and which identifies, among other things, the services provided to the patient, the symptoms or diseases suffered by the patient, and the medical professional providing the services. When requesting payment by submitting a claim, the provider further certifies, expressly and impliedly, that the information provided is truthful. At all times relevant to this action, Advantica, upon information and belief, reviewed and approved the claims at issue in this case based upon the enrollment and claim information provided by Defendant, and relied on the veracity of the information in determining whether to pay the claims submitted by Defendant.

17.     When submitting claims to government healthcare programs, healthcare professionals are identified by a provider number. No healthcare provider may submit claims and receive payment from the government for services provided to Advantica Medicare beneficiaries unless the provider has first applied for and received a provider number. Once approved, the provider number designated by Medicare is unique to that Medicare provider. All claims submitted by the Medicare provider must utilize the specific provider number, and all Medicare payments for reimbursement must be identified by the specific provider

number. The Defendant used its provider number when submitting the claims at issue to Advantica Medicare.

### C.    Requirements for Payment

18.    "Medicare will consider cataract surgery medically necessary and reasonable" if, among other things, a patient has a visual acuity "worse than 20/40 with impairment of ability to carry out needed or desired activities. The ocular exam should confirm that the best correctable visual acuity in the affected eye is worse than 20/40 and that the cataract is responsible for this." First Coast, Local Coverage Determination L29095, effective March 31, 2009, attached as **Ex. A**. At all material times, Advantica followed this or similar directives when providing coverage of cataract services as Advantica also required worse than 20/40 impairment.

## SUMMARY OF THE FACTS

19.    Relator Nilsson has worked as an OA at ECF from August 1, 2013 to date. As an OA, Nilsson conducts patients' eye examinations, fills out patient charts in accordance with her examination results, and discusses such results with patients. More specifically, during examinations, Nilsson conducts patient histories and medication verifications, and performs visual acuity, refraction, and pressure tests, as well as any additional tests that are indicated on patients' exam forms.  Nilsson then completes each patient's exam form with her examination and test results so that the form can be supplied to the physician.

20.    Nilsson works primarily at ECF's main office in Ft. Myers, but occasionally works at ECF's Clewiston, Lehigh, Cape Coral, Port Charlotte, and East Fort Myers offices.

Nilsson generally works from 8:00 a.m. to 4:00 p.m. Monday through Friday and also on one Saturday each month.

21.     Relator Smith worked as ECF's Clinic Operations Manager from July 15, 2013 to October 24, 2013. As a Clinic Operations Manager, Smith directly supervised ECF's certified and non-certified OAs, as well as patient registration and charge capture for medical services. Smith was responsible for reviewing charges for medical services entered for reimbursement from various providers, including Advantica Medicare.

22.     Smith worked primarily at ECF's main office in Ft. Myers, but routinely visited all of ECF's other offices as part of her primary responsibilities. Smith generally worked from 8:00 a.m. to 5:00 p.m. Monday through Friday, but as a salaried employee, she was on call at all times. Smith quit her employment based upon the activities discussed herein.

## A.     Falsification of Exam Results

23.     On Nilsson's second day of work at ECF, another ECF OA, asked Nilsson to "re-write" the results from an examination that Nilsson had conducted on a patient and to alter the patient's chart to give the patient worse vision scores than they had actually received. Nilsson refused.

24.     Shortly thereafter, Nilsson noticed that her initials appeared on a patient chart next to another set of initials and that the handwriting on this chart was not hers. The two sets of initials appeared in a section labeled "W/up Tech," in which the initials of the ECF employee who "worked up" the chart (*i.e.*, conducted the examination and filled out the

chart) are to be placed. However, this particular chart was not in Nilsson's handwriting and she did not fill it out.

25.     In fact, Nilsson discovered that when there were two sets of initials written on charts, the charts had been "rewritten" by another OA. In other words, after Nilsson conducted an eye exam, documented the results of the exam, including but not limited to Visual Acuity Test results, and wrote her initials on the chart, another ECF employee would "rewrite" the entire chart and place Nilsson's initials, along with the other ECF employee's own initials, in the "W/up Tech" section.

26.     Nilsson observed that when charts were rewritten, certain exam results that she recorded were altered to meet Advantica Medicare (hereinafter "Advantica" or "Medicare") requirements for additional testing or surgery. For example, when a patient's vision was not poor enough to justify cataract extraction surgery, the chart would be "rewritten" and the patient's scores would be altered so that the patient's vision was poor enough to qualify for surgery.

27.     Nilsson observed that numerous charts, including, but not limited to Patient A's results, were rewritten by ECF employees to include false test results, which allowed ECF to recommend and perform unnecessary surgeries, and then, upon information and belief, submit claims to Advantica Medicare for these unnecessary surgeries, including but not limited to cataract extraction. Nilsson personally observed that the rewriting of patient charts and the falsification of the tests results therein was common and encouraged by ECF management and staff.

28.     ECF's "original" charts showing accurate vision testing, a number of which Nilsson retained on *e.g.* Patients A and B, illustrate how charts were rewritten and how examination results were altered in order to justify a surgery recommendation.

29.     For example, in the case of Patient A, on November 6, 2013, Nilsson had personally conducted the examination on this patient and her documentation for Patient A recorded the patient's visual acuity in the section labeled CC as 20/30 and 20/25. Under the "W/up Tech" section, she recorded her initials, "pfn." The same chart was subsequently rewritten and the falsified version for Patient A, which also stated the date of examination as November 6, 2013, then stated that the patient's visual acuity was 20/50 and 20/50, not the 20/30 and 20/25 as shown by the vision testing actually performed and documented by Relator Nilsson. The rewritten "W/up Tech" section bore the initials "PN/AC," indicating that the chart was written up by both Nilsson and another OA. The new chart was not in Nilsson's handwriting. Also, the new chart stated in the "ECC Next" section, "admit," which meant that the patient should have been admitted for cataract extraction based on the results of the vision testing. Additionally, both the original and old charts were marked "ADV," which indicated that Patient A was insured by Advantica.

30.     In the case of Patient B, an ECF employee wrote "Redo" across the patient's chart, indicating that the chart needed to be rewritten. The chart was also been marked "ADV", which indicated that Patient B was insured by Advantica. An ECF employee wrote "Redo" on the chart because the actual visual acuity score recorded on the chart would not meet Advantica Medicare's coverage guidelines for cataract extraction surgery (worse than 20/40 visual acuity).

31.    For each patient visit, ECF retains a patient chart, a hard copy version of which is retained in ECF's patient record files. Nilsson observed that when patient charts were rewritten, the original charts/test results did not appear in the medical record and only the rewritten charts were retained. Nilsson observed that ECF employees shredded original charts. She believed they did so in order to destroy evidence of falsification. When possible, Nilsson kept copies of her original charts when she believed that they might later be altered by another OA to meet Advantica Medicare cataract criteria.

32.    As part of her job as Clinic Operations Manager, Relator Smith audited a random sample of patient charts each day, which were attached to "face sheets" in order to ensure that all tests had been checked for charge entry. Insurance and demographic information, including age, is contained on face sheets. Essentially, Smith was to confirm that the checkout staff had properly entered the charges throughout the day. During these audits, Smith was to ensure that procedures in the charts had been submitted to ECF's billing department for billing to insurance payors.

33.    After speaking with Nilsson, Smith noticed during her audits that there were two sets of initials in the "W/up Tech" section of certain Advantica patient charts. Relator Nilsson explained to Smith that when charts featured double initials in the "W/up Tech" section, this meant that the charts had been altered. Once Smith found out that ECF employees were altering patient charts, she was mindful of charts with two sets of initials, and saw them often.

34.    Based on Smith's observations, nearly all of the charts with two sets of initials that she noticed in her audit samples were Advantica charts, and, based on the age of these patients, these charts were for Advantica Medicare patients.

35.    When the examination results for cataract evaluations, which were almost always administered to Medicare patients, did not meet the visual acuity requirements for Advantica Medicare coverage, the charts were altered.

36.    Smith also observed that when patient charts were rewritten, the original charts/test results did not appear in the medical record and only the rewritten charts were retained. Upon information and belief, ECF employees destroyed, or intended to destroy, the original charts for Patients A & B and these original charts are therefore, upon information and belief, not included in any of ECF's records.

37.    ECF financial counselors served as ECF's insurance experts and often communicated with Advantica to determine Advantica and Medicare's reimbursement standards. They prepared the patient record for surgery, including obtaining authorization and talking to patients regarding self-pay balances. They often rejected records that didn't comply with Advantica Medicare requirements. They returned records for exams that did not comply with Advantica Medicare requirements to other ECF employees who then altered or "re-wrote" the patient records in order to "comply" with the requirements and render ECF services eligible for reimbursement. When ECF's financial counselors returned these charts, "Re-Write" or "Re-Do" was sometimes written on the charts, indicating that they should be changed in order to qualify a patient for surgery or additional testing. ECF's financial counselors would accept falsified "compliant" records for billing.

38.    When returning a "noncompliant" record to one ECF OA for alteration, Nilsson heard an ECF financial counselor instruct the OA that "this is not gonna cut it."

39.    The same ECF employees that rewrote patient charts also altered examination results during the exams that they personally conducted by simply writing in incorrect results that would qualify patients for surgery or additional testing or by simply not showing the patients smaller lines on visual exams, because these smaller lines could have indicated better vision than recorded.

40.    During a team meeting with many OAs, a Lead ECF OA instructed the OAs, including Nilsson, that OAs were not to "push" cataract patients to see better during refraction and glare portions of exams. As a result, inaccurate and worse vision scores could be recorded, and thus more cataract patients could qualify for surgeries which could be billed to Advantica Medicare.

41.    The Lead OA instructed the OAs, for example, that they should not even give patients the opportunity to try to read the smaller rows of letters on the refraction test or "push" them to do so. It was understood by attendees that allowing patients to read the smaller rows could result in visual acuity scores that were too good to justify surgery under Advantica Medicare requirements. However, by failing to conduct a complete refraction test, and by recording inaccurate test results, the test results and corresponding claims submitted were false and were fabricated to enable ECF to administer and bill Advantica Medicare for unnecessary tests and surgeries. Upon information and belief, payors other than Advantica were also billed for unnecessary tests and surgeries, including Medicare.

42.    One OA under Smith's supervision met with Smith during the week of October 14, 2013 regarding ECF's falsification of patient charts. The OA reported that another ECF employee had complained that the OA's examination results were "inappropriate" for billing. When the OA refused to alter these "inappropriate" charts, the OA was formally written up for insubordination on October 23, 2013. Smith spoke with an ECF human resources representative and ECF's Chief Operations Officer regarding the disciplinary actions taken against the OA. ECF's human resources representative told Smith that this was "out of her control," and ECF's Chief Operations Officer explained that the OA's refusal to alter charts was "causing problems" for the doctors. On October 24, 2013, the OA was terminated.

43.    As a result of ECF's falsification of examination results, upon information and belief, patients other than just Patients A & B received surgeries that, based on their actual examination results, were not medically necessary and did not qualify for Medicare reimbursement. (Nilsson discovered, based on ECF's electronic patient calendar, that Patient A was scheduled for cataract extraction surgery on November 27, 2013 in the left eye and Patient B actually received cataract extraction surgery on the right eye on October 6, 2013.)

44.    These unnecessary cataract extractions not only inflicted needless pain and suffering upon unsuspecting patients, but also exposed them to the health risks inherent in these surgeries.

45.    Smith performed an insurance charge check at the end of each day, during which she would confirm that each test that had been performed that day had been billed in full to the correct insurance provider. Smith personally observed that cataract examinations

and cataract extraction surgeries on patients over the age of 65 were billed to Advantica Medicare. Based upon Smith and Nilsson's observations, as well as information and belief, unnecessary tests and surgeries were billed to Advantica Medicare (and other payors, including Medicare) based on records that were falsified by ECF, including but not limited to cataract extraction surgery on Patients A & B.

### B.      Pre-Filling of Patient Conditions and Required Tests

46.      Additionally, when conducting eye exams, Nilsson was often given patient charts with certain portions already completed ("pre-filled") and was instructed to complete only the remaining portions. Another ECF employee would fill in certain patient conditions, required tests, or test results before the exam even began. By doing so, the patients' charts would purportedly justify the ordering of additional tests or surgeries, which could then be billed to Advantica Medicare or other payors, including, upon information and belief, Medicare.

47.      Smith also noticed pre-filled charts when she was auditing charts because the handwriting was not the same in the conditions, testing, or results sections as it was in the examination section. Smith personally observed that charts with different handwriting in these sections were very common.

48.      ECF employees instructed Smith to tell OAs to require as many tests as possible. Smith was required to audit patient charts to ensure that OAs conducted every test as often as Medicare guidelines would allow, regardless of the patients' conditions or their

actual test results. Nilsson observed that charts were pre-filled without any attempt to determine the accuracy of alleged test results.

49.     Smith personally observed that OAs generally pre-filled patient charts about two days prior to appointments, but would pre-fill charts as late as the morning before the appointment if they fell behind.

50.     In the case of Patient C, the patient's exam results are fabricated and pre-filled. In Patient C's initial examination on October 18, 2013, the patient did not receive a BAT ("Brightness Acuity Test") and thus, no test results were entered in the BAT section. Nilsson received the chart for Patient C's subsequent follow up examination with Dr. Brown with a BAT score, however. The information on this chart had been pre-filled before any exam had been conducted and before either an OA or Dr. Brown had seen Patient C. A BAT score had fabricated for the patient in the BAT section. The BAT score in the pre-filled chart was false and any claims submitted to Advantica Medicare based on this false record would therefore also be false.


C.     Unnecessary and Useless Testing

51.     Nilsson also observed that fundus photos, photographs of the back of the eye during dilation that are examined to detect various conditions, were ordered for nearly every patient, even when the photos were not medically necessary. Fundus photos were loaded into an electronic database and were never used or interpreted by any ECF physicians or staff, rendering them completely useless and unnecessary. The claims for such photos, which were

submitted to Advantica Medicare and, upon information and belief, Medicare, were false and represented services which were medically unnecessary.

52.    ECF employees instructed ECF OAs, including Nilsson, to make sure to take fundus photos as often as Medicare regulations allowed. No references were made to medical necessity.

53.    ECF's COO instructed Smith to make sure that OAs in all ECF offices were ordering as many diagnostic tests as possible.

54.    ECF's COO required that Smith calculate the number of times that each physician performed each test each week and report her calculations to ECF management. If too few tests were being performed, ECF's COO instructed Smith to speak with the OAs, rather than the physicians, about "bringing the numbers up."


**D.      False Billings for Services Performed by a Physician's Assistant**

55.    Each Friday, from September 13 through at least October 25, 2013, an ECF Ophthalmologist (the "MD") certified that he performed certain procedures and signed the patient charts for these procedures, when the procedures were in fact performed by a Physician's Assistant ("PA") in ECF's Clewiston office.

56.    Smith personally observed that the Clewiston PA brought her patient charts to the MD each Friday so that the MD could certify that he performed the procedures and sign the related charts. The charts were signed by the MD because, during this time period, no medical doctor was in the Clewiston Office on Fridays.

57.     Smith was specifically instructed by ECF's COO to ask the Clewiston PA to deliver the unsigned charts to the MD and to bill for these procedures using the MD's billing code. Smith did so. The Clewiston PA then confirmed with Smith that she had brought the charts and that the MD had signed them.

58.     Smith personally observed that ECF's Clewiston Office serviced Medicare/Medicaid patients, including Advantica Medicare beneficiaries, almost exclusively; thus, upon information and belief, these services based on falsified charts were billed to Medicare and/or Medicaid, at the ECF COO's direction.

### E.     Knowledge and Encouragement of Fraudulent Practices

59.     ECF employees who implemented ECF's fraudulent practices were trained to do so by ECF management from the beginning of their employment.

60.     For example, when Nilsson brought up the rewriting of patient charts with two OAs who had both worked at ECF since at least November 2011, they told Nilsson that they "had always done it this way."

61.     In early August 2013, shortly after joining ECF, Nilsson reported that charts were being rewritten to falsify examination results to ECF's Clinic Coordinator. However, these issues were not addressed as the Clinic Coordinator's employment with ECF ended in mid-August 2013. An ECF human resources representative later informed Smith that ECF terminated the Clinic Coordinator because she suggested that a patient get a second opinion regarding the necessity of cataract extraction surgery.

62.   Nilsson also reported that charts were being rewritten to an ECF human resources representative. The ECF human resources representative explained that she had heard about these practices from multiple employees, many of whom either quit working for ECF, or were terminated by ECF, because they refused to participate in ECF's fraudulent activities. She also assured Nilsson that she would talk to ECF management about Nilsson's concerns, but, to Nilsson's knowledge, ECF's fraudulent practices were never further addressed or remedied. The same ECF human resources representative later mentioned to Smith that she was searching for a new job because she was similarly concerned with the legality of ECF's practices.

63.   Smith also reported that charts were being rewritten and that tests were being administered without a physician's order directly to ECF's COO. ECF's COO shrugged off Smith's reports and asked Smith if she didn't think that the patients wanted "crisp, clear vision." ECF's COO repeatedly refused to address the illegality of ECF's practices.

64.   Nilsson then reported that charts were being rewritten to ECF's new Clinic Coordinator. The new ECF Clinic Coordinator did not address Nilsson's concerns and wanted to make sure that the OAs did what ECF management wanted.

65.   Nilsson also reported that charts were being altered to her ECF department leader.

66.   When Nilsson complained about ECF's fraudulent practices in a team setting, during which most of the Fort Myers Office OAs were present, many of the OAs confirmed that they were taught to follow these practices when they joined ECF and that they did what they were told so that they could keep their jobs.

67.     Additionally, Smith confronted ECF's Credentialing & Compliance Manager about ECF's practice of falsifying patient charts, who said that she knew, but was powerless to change it.

68.     In response to Relators repeated efforts to report ECF's fraudulent practices, ECF staff and management repeatedly informed Nilsson and Smith that this was simply the way that things had always been done.

69.     Nilsson made sure to inform patients who did not have poor vision that they did *not* need surgery. However, upon information and belief, an ECF Physician would then speak to the patients privately in the examination room and tell them that the cataract needed surgery. Unfortunately, upon information and belief, most patients trusted the ECF Physicians' opinion over Nilsson's opinion as an OA.

## DEFENDANT'S KNOWING SUBMISSION OF FRAUDULENT CLAIMS

70.     ECF committed the fraudulent practices set forth above in ¶¶ 22-69 in violation of Medicare rules and regulations (the "Fraudulent Practices") and the FCA.

71.     Upon information and belief, ECF implemented, and continues to implement, the Fraudulent Practices with respect to patients over the age of 65 with Advantica Medicare or other coverage, including Medicare.

72.     Upon information and belief, and based upon the fact that numerous ECF employees have reported, with respect to the Fraudulent Practices, that this is the way "that things have always been done," ECF has implemented the Fraudulent Practices described above for many years prior to Relators' employment. In any case, ECF has implemented the

Fraudulent Practices described above beginning no later than July 2013, when Smith joined ECF, and presently continues to do so.

73.     ECF has administered, billed Advantica Medicare for, and, upon information and belief, received reimbursement from Advantica Medicare and other payors, such as Medicare, for tests and surgeries based upon the Fraudulent Practices, including, but not limited to, upon information and belief, Patients A, B, and C, and other patients and presently continues to do so.

74.     Based on the Relators' personal observations, ECF violated the FCA by submitting claims to Advantica Medicare in order to receive payment for tests and surgeries based on the Fraudulent Practices (the "Claims").

75.     Smith personally observed, based on her experience in ECF's billing department, that ECF's patient insurance was comprised of approximately 80% Medicare/Medicaid, including but not limited to Advantica Medicare, 15% Commercial, and 5% Self-Pay.

76.     Based on Nilsson's personal experience with ECF patients, approximately 80% of ECF patients are over 65 years old or older and therefore would qualify for Medicare.

77.     Because the Fraudulent Practices were consistently supported, encouraged, and implemented by the ECF management and staff, despite numerous warnings from both Nilsson and Smith that their actions were fraudulent and illegal, ECF knew that the Claims submitted were false and fraudulent and based on false and fraudulent records.

78.     Had Advantica Medicare and, upon information and belief, other payors, such as Medicare, known the true nature of the Claims, they would not have reimbursed ECF for the Claims.

79.     ECF has billed Advantica Medicare and, upon information and belief, other federal payors, such as Medicare, for the Claims despite the fact that the Claims are not eligible for reimbursement and ECF has therefore damaged the federal treasuries, which should only have been billed for, and should have only reimbursed ECF for, eligible medical services that complied with Medicare coverage criteria, applicable Local Coverage Determinations, and federal regulations.

## CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

80.     Paragraphs 1 through 79 are incorporated by reference as if fully set forth herein.

81.     In violation of 31 U.S.C. § 3729(a)(1)(A), Defendant knowingly presented, or caused to be presented to Advantica Medicare and, upon information and belief, other federal payors, including Medicare, false and fraudulent claims for payment or approval, and specifically billed federal healthcare programs for unnecessary and worthless cataract extraction surgeries and ophthalmological tests and/or tests which were not performed.

82.     As a result of Defendant's violations of 31 U.S.C. § 3729(a)(1)(A), Plaintiff has suffered damages and therefore is entitled, pursuant to 31 U.S.C. § 3729(a)(1), to treble damages as determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT TWO
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)

83.     Paragraphs 1 through 82 are incorporated by reference as if fully set forth herein.

84.     In violation of 31 U.S.C. § 3729(a)(1)(B), Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim. Defendant did so by taking certain actions, including but not limited to altering examination results on patient charts and pre-filling conditions and tests on patient charts which were not present and not performed and then submitting claims for unnecessary tests and surgeries to Advantica Medicare and, upon information and belief, other federal payors, including Medicare, based on these false patient records.

85.     As a result of Defendant's violations of 31 U.S.C. § 3729(a)(1)(B), Plaintiff suffered damages and therefore is entitled, pursuant to 31 U.S.C. § 3729(a)(1), to treble damages as determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT THREE
## PAYMENT BY MISTAKE

86.     Paragraphs 1 through 85 are incorporated by reference as if fully set forth herein.

87.     The false claims that Defendant submitted to Plaintiff's agents were paid based upon mistaken or erroneous understandings of material facts including, but not limited to, the mistaken fact that Defendant had rendered valuable and medically necessary medical

services as claimed in their billings based on alleged accurate medical records and treatment actually rendered.

88.     Plaintiff, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Defendant's certifications and representations in their billed claims, paid Defendant certain sums of money to which Defendant was not legally entitled.

89.     Defendant must therefore account for and pay such amounts, as determined at trial, to Plaintiff.

## COUNT FOUR
## UNJUST ENRICHMENT

90.     Paragraphs 1 through 89 are incorporated by reference as if fully set forth herein.

91.     By directly or indirectly obtaining federal funds to which Defendant was not legally entitled, Defendant received a benefit, which would be unjust and inequitable for Defendant to retain.

92.     Defendant has therefore been unjustly enriched and must account for and pay such amounts, or the proceeds therefrom, as determined at trial, to Plaintiff.

93.     Relators reserve their right to amend this Complaint to add additional allegations and causes of action against the Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray, on behalf of Plaintiff, that this Court:

1.      For Plaintiff's Causes of Action under 31 U.S.C. § 3729(a)(1)(A-B), enter judgment against Defendant for the amount of Plaintiff's damages, trebled pursuant to 31 U.S.C. § 3729(a), and civil penalties in the amount of $11,000 for each knowing violation of the FCA;

2.      For Plaintiff's Causes of Action for payment by mistake and unjust enrichment, enter judgment against Defendant in the amount of Plaintiff's damages and/or the amount by which Defendant was unjustly enriched or which Defendant retained illegally;

3.      Require that Defendant provide an accounting of all revenues illegally obtained or retained by Defendant;

4.      Award Relators all costs, including court costs, expert fees, investigative expenses, and reasonable attorneys' fees incurred by Relators in the prosecution of this suit;

5.      Grant Relators and the United States leave to amend the Complaint based on any new evidence acquired throughout the discovery process; and

6.      Grant Relators and the United States such other and further relief that the Court deems appropriate and proper.

Respectfully submitted,

Bradley P. Rothman, Trial Counsel
Florida Bar No. 0677345
Weldon & Rothman, PL
7935 Airport Pulling Road N., Suite 205
Naples, Florida 34109
Telephone: (239) 262-2141
Facsimile: (239) 262-2342
Email: brothman@weldonrothman.com

**-and-**

Richard C. Rose
Tennessee Bar No. 017544
Lynzi J. Archibald
Tennessee Bar No. 030063
Miller & Martin PLLC
Volunteer Building, Suite 1000
832 Georgia Avenue
Chattanooga, Tennessee 37402-2289
Telephone: (423) 756-6600
Facsimile: (423) 785-8480
Email: rrose@millermartin.com
Email: larchibald@millermartin.com
*Counsel for Plaintiff-Relators*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing was

served via UPS Next Day Air in a properly addressed envelope, postage prepaid, to assure

delivery to:

Honorable Eric H. Holder, Jr.
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

A. Lee Bentley, III, Esq.
Acting U. S. Attorney, Middle District of Florida
400 North Tampa Street, Suite 3200
Tampa, Florida 33602

Kyle S. Cohen, Esq.
Assistant U. S. Attorney, Middle District of Florida
2110 First Street, Suite 3-137
Ft. Myers, Florida 33901

This _____ day of December, 2013.


**WELDON & ROTHMAN, PL**

By: _____
      Bradley P. Rothman